340 F.Supp. 492 (1972)
In re PUERTO RICO AIR DISASTER LITIGATION.
Michael J. HUDACEK, Executor of the Estate of Joseph J. Hudacek a/k/a Joseph Hudacek, Deceased, Plaintiffs,
v.
PUERTO RICO INTERNATIONAL AIRLINES, INC., et al., Defendants.
M.D.L. No. 47, Civ. A. Nos. 70-57, 70-58, 70-61, 70-62, 70-76, 70-77 to 70-79.
United States District Court, D. Puerto Rico.
March 7, 1972.
*493 *494 Arthur D. Dalessandro, Wilkes-Barre, Pa., Falvello, Ustynoski, Giuliani & Bernstein, Hazelton, Pa., Michael J. Hudacek, Plymouth, Pa., for plaintiffs; Anthony C. Falvello, Joseph J. Ustynoski, Hazelton, Pa., of counsel.
Haight, Gardner, Poor & Havens, New York City, for defendants; Walter E. Rutherford, Robert L. Alpert, New York City, of counsel.
EDWARD WEINFELD, District Judge.
Plaintiffs, in their representative capacities, commenced these wrongful death[1] and survival[2] actions to recover damages arising out of the deaths of their respective four decedents, who were killed on March 5, 1969, while passengers in an airplane which crashed in the El Junque mountain range in the vicinity of San Juan, Puerto Rico, enroute from the island of St. Thomas to San Juan. The defendant, Puerto Rico International Airlines, Inc. (herein PRINAIR), a Puerto Rican corporation, was the owner and operator of the aircraft. The decedents were residents of Pennsylvania, as are the plaintiff representatives, and the actions were commenced in the Middle District of Pennsylvania[3] on February 19, 1970, based upon federal diversity jurisdiction.
Subsequently, on March 4, 1970, four additional actions were commenced, also in the Middle District of Pennsylvania, naming as additional defendants Great American Insurance Company and United States Aviation Underwriters, Inc. Thereafter, all eight actions were transferred to the District of Puerto Rico pursuant to the Multidistrict Litigation Act, 28 U.S.C., section 1407,[4] where plaintiffs also have pending four actions based upon the same claims as advanced in their Pennsylvania actions. Following argument on a motion to dismiss the Pennsylvania actions on various grounds,[5] plaintiffs consented to the dismissal with prejudice as to Union,[6] Great American Insurance Company and the United States Aviation Underwriters, Inc. Thus, the sole remaining defendant is PRINAIR, which now moves to dismiss the Pennsylvania actions for lack of personal jurisdiction on the ground that it is a Puerto Rican corporation doing business exclusively there; that it is not registered to do *495 business in Pennsylvania and does no business there.
Since federal jurisdiction is based upon diversity of citizenship, the law of Pennsylvania governs on the issue of "doing business" subject to federal constitutional limitations.[7] Those federal constitutional limitations require that before a state may subject a foreign corporation to its jurisdiction upon a claim arising out of the state, the corporation's activities within the state must be sufficient in amount and kind so that it is "reasonable and just" to require it to respond to the lawsuit there.[8] The plaintiffs have the burden of establishing the facts necessary to sustain their claim of jurisdiction,[9] and the issue must be decided within the framework of the particular facts of this case.
Plaintiffs took extensive depositions of officers and directors of PRINAIR and Union, and these form a part of the record upon which plaintiffs seek to uphold, and the defendant resists, jurisdiction. A careful study of the voluminous depositions demonstrates that the traditional indicia of "doing business" are absent; further, that the principal ground advanced to uphold jurisdiction, the so-called interline arrangements which PRINAIR has with other carriers and its advertising in trade magazines and periodicals, hereafter discussed, is insufficient to subject PRINAIR to in personam jurisdiction in Pennsylvania. Tested under Pennsylvania's admittedly liberal foreign corporation jurisdiction law,[10] the facts here presented do not make PRINAIR amenable to its jurisdiction. Section 1011, subd. C of its Business Corporation Law[11] provides as follows:
"For the purposes of determining jurisdictions of courts within this Commonwealth, the doing by any corporation in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object, or doing a single act in this Commonwealth for such purpose, with the intention of thereby initiating a series of such acts, shall constitute `doing business.' For the purposes of this subsection the shipping of merchandise directly or indirectly into or through this Commonwealth shall be considered the doing of such an act in this Commonwealth."
PRINAIR operates its planes between San Juan, Puerto Rico, and St. Thomas, St. Croix and other points in the Caribbean. The evidence abundantly establishes that it maintains no office or other place of business, nor has it any office address or telephone listing, in Pennsylvania; that it has no bank account there; that it has not shipped merchandise directly or indirectly to or through the state, nor has it bought or sold merchandise there; that it owns or leases no property there; that it has flown no airplanes in the Commonwealth; that it maintains no facility for the sale of tickets there; that its employees have never solicited business or advertised in the state. All of its activities, operational and executive, are carried on in and directed by its officers and personnel *496 from its San Juan, Puerto Rico office, where its financial and corporate records are maintained, as well as those documents required by governmental authorities; most of the meetings of its board of directors are held there and some are held in New York City.
Plaintiffs' claim that PRINAIR's parent corporation, Union, a New Jersey corporation, with its principal place of business in Verona, Pennsylvania, is PRINAIR's alter ego is not borne out by the record. On the contrary, PRINAIR, subsequent to the acquisition of 100% of its stock by Union Corporation in December 1969, nine months after the accident, continued to carry on its corporate functions, operating and executive, as it did prior thereto. PRINAIR's corporate identity has been strictly preserved since it became Union's subsidiary; its activities and records and those of its parent are kept separate and distinct at all times. Each maintains the integrity of its corporate existence separate and apart from the other. In sum, there is "rigorous adherence to the formalities customarily associated with separate corporations ...."[12]
That Union is doing business and maintains its principal place of business in Pennsylvania does not subject a subsidiary to Pennsylvania jurisdiction so long as it is maintained as a separate and independent unit from Union.[13] Nor is the fact that a number of directors and officers are the same for parent and the subsidiary in and of itself sufficient to subject the non-resident subsidiary to jurisdiction, absent a showing that the parent is the subsidiary's alter ego.[14]
Plaintiffs, however, contend that certain acts performed at Union's office in Verona, Pennsylvania on behalf of PRINAIR satisfy the test of doing business under Pennsylvania law. The Verona office is the center at which reports of Union's approximately twenty-six subsidiaries are received and considered by its executives. That Bernard Sabel, a vice president of PRINAIR and also a director of Union, resides in Pittsburgh, works there as well as at Verona, and receives a salary from PRINAIR for "tak[ing] part in [its] general overall management," does not establish that it is doing business in Pennsylvania absent a showing that he performed substantial services for PRINAIR there, and no such showing has been made. The services performed were on behalf of the parent corporation. And so, too, that John Moeller, executive vice president and a director of the parent corporation, whose services for it are performed by him at Verona, was elected a non-salaried vice president of PRINAIR, when in December 1969 Union acquired all the stock of PRINAIR, does not by itself subject PRINAIR to Pennsylvania jurisdiction. His duties there are exclusively performed on behalf of Union. In his capacity as its executive vice president and director, he reviews the financial reports of the various subsidiaries, including PRINAIR, generally oversees their operation, coordinates their functional requirements so that they fit in with the total picture and capabilities of Union in giving direction to its subsidiaries. In carrying out the overall policy of Union, he, as well as the parent's *497 other officers, are acting for the parent and not for the subsidiary, which has its own directors and officers.[15] That the parent exercised dominion over PRINAIR by reason of its 100% stock ownership does not mean that PRINAIR was doing business in Pennsylvania.[16]
Perhaps recognizing that they have failed to establish the traditional indicia of doing business, plaintiffs' principal reliance is upon PRINAIR's "interline" arrangements with other airlines and advertisements by PRINAIR in certain travel magazines. PRINAIR advertises the availability of its services in "Travel Trade," "Travel Age," "East Travel Age," and "West Travel Age," which are trade publications. The advertisements are placed by PRINAIR with the magazine publisher in New York and a New York address and phone number are listed for it. The magazines are distributed to travel agents throughout the United States and presumably in Pennsylvania. Assuming arguendo that this may be considered solicitation of business, it is clear that, without more, it does not constitute doing business under Pennsylvania law.[17] Plaintiffs contend there is more based upon certain arrangements with other carriers.
PRINAIR does not sell tickets in any state of the United States; all its tickets are sold in Puerto Rico. However, a passenger in the United States may book a flight on PRINAIR through originating carriers who do not have routes to points in the Caribbean serviced by PRINAIR. Such a flight, referred to as an interline passage, is arranged under an agreement between PRINAIR and an originating carrier. A copy of the agreement was not produced, but according to the deposition testimony, the procedure operates generally in this manner: presently, three carriers, Eastern, Pan American and American Airlines, originate flights from New York or other points in the United States to San Juan, Puerto Rico, but are not licensed to fly from there to points beyond, such as St. Thomas or St. Croix, serviced by PRINAIR from San Juan.
The plaintiffs' decedents here purchased PRINAIR tickets through a travel agent in San Juan for the trip to and from San Juan to St. Thomas. However, a passenger in the United States who wishes to go to St. Thomas may purchase his through flight ticket in the United States. His originating carrier, whether Eastern, Pan American or American, will sell the passenger a through ticket  that is, a ticket to San Juan, the initiating carrier's terminal point, with a coupon for the trip from there to St. Thomas on the PRINAIR line. The originating carrier, prior to the issuance of its ticket for the entire trip, verifies with PRINAIR that space is available for the continued trip from San Juan to St. Thomas. The passenger pays the full fare to the originating carrier, including the portion of the trip from San Juan to St. Thomas, and the through ticket is issued in its name. PRINAIR picks up the coupon covering its flight from the passenger, and, after accumulating all such coupons during a month, bills the originating carrier for the total fares due it, less a seven per cent commission. Such an interline passage may also be effected by a passenger through his travel agent, *498 whether located in Pennsylvania or any other state. However, the travel agent's dealings are with the originating carrier; he has no contact with PRINAIR. Finally, PRINAIR has no arrangement or agreement with any travel agent in Pennsylvania to act for it in the sale of tickets.
The interline tickets sold by originating carriers account on an annual basis for forty to fifty per cent of PRINAIR's sales, which include sales not only in the United States, but all over the world. The record does not reveal what percentage, if any, of the interline ticket sales originated in Pennsylvania. However, it is likely that some Pennsylvania residents, through travel agents in Pennsylvania, have booked interline passage on PRINAIR flights through originating carriers, and that this may have been the result of advertising material received by such travel agents. It should be noted that all the magazine advertising offered in evidence covered the period of only October and November 1971, two and a half years after the occurrence which gave rise to these suits  and not quite two years after the initial service of process. The relevance of this evidence is questionable,[18] since a claim of jurisdiction on the basis of doing business under Pennsylvania law refers to such activity at the time of service of such process.[19]
In any event, the issue remains whether, absent any other activity within the Commonwealth by PRINAIR, its interline arrangement with the named carriers is sufficient to subject PRINAIR to in personam jurisdiction upon a claim for the death of a Pennsylvania citizen occurring outside the state. Counsel agree that Pennsylvania's highest court has not ruled upon the issue. Accordingly, this court is called upon to decide whether the Pennsylvania courts, in the light of its statute and judicial determinations thereunder, would hold PRINAIR subject to its jurisdiction[20] and, if so, whether it accords with federal constitutional restrictions to be decided by federal standards.[21] At the outset, it is recognized that Pennsylvania does have an interest in the protection of its citizens, but the accident here had no relation to any contact by PRINAIR with the state. As already stated, the tickets used by the decedents for passage on the trip were purchased in San Juan. The argument for jurisdiction comes down, therefore, to the contention *499 that the activities of the originating carriers in Pennsylvania under the interline agreement and the distribution of PRINAIR's advertising material are sufficient to establish PRINAIR's "entry" or "presence" in Pennsylvania for jurisdictional purposes[22] even in the absence of evidence that in fact any interline ticket providing for passage on a PRINAIR flight has ever been sold in Pennsylvania. The most that has been established, as already referred to, is that it is "likely" this occurred.
Even accepting that it is "the public policy of Pennsylvania ... to extend in personam jurisdiction to the full measure consistent with due process,"[23] no state authorities appear to support plaintiffs' position that upon the facts here presented Pennsylvania courts would hold that PRINAIR is subject to its jurisdiction. The cases relied upon by plaintiffs are readily distinguishable upon their facts. In S. M. Stein Enterprises, Inc. v. Irish International Air Lines,[24] the defendant maintained its own sales office in Philadelphia. In Giuliano v. Alitalia Airlines, Inc.,[25] the defendant operated two sales offices in Philadelphia, employed eleven persons, and in addition there were about 120 travel agents in Pennsylvania authorized to sell its tickets; it collected one million dollars in revenue in one year; further, it operated its aircraft in Pennsylvania at least five times, and on one occasion a jet landed at the Philadelphia International Airport. In Triangle Publications, Inc. v. Standard Plastic Products, Inc.,[26] the defendant's sales director entered the state to solicit business; shipments of defendant's products in excess of $1,250,000 over a three-year period were made to Pennsylvania customers, and the merchandise claimed to infringe plaintiff's trademark was shipped to Pennsylvania customers. Similarly, the other cases[27] relied upon by plaintiffs bear no factual resemblance to the instant case.
On the other hand, in cases where the facts more closely parallel those of the instant case, courts construing Pennsylvania law have disclaimed jurisdiction. Thus, in Optico Corp. v. Standard Tool Co.,[28] defendant, a Massachusetts corporation which maintained no Pennsylvania business location, no Pennsylvania bank account, mailing address or telephone listing, was held not to be "doing business," although it advertised in nationally circulated publications and derived some 7.5% of its sales, totalling $150,000, from Pennsylvania customers through Pennsylvania sales representatives who acted as independent contractors and were paid a commission only on *500 sales approved at the Massachusetts office. The facts there presented in support of jurisdiction, which included visits to defendant's customers in Pennsylvania by its officers and employees, were much stronger than those here advanced.[29]
Similarly, in Strauss v. Delta Air Lines, Inc.,[30] a defendant was held not to be doing business such as to subject it to jurisdiction on a cause of action arising out of activities unrelated to those conducted by defendant within the Commonwealth, despite the fact that over a two-year period it stationed a number of employees in the state, expended over $2,000,000 for advertising in publications that were circulated in Pennsylvania, purchased over $5,000,000 worth of products there, maintained a balance of between $100,000 and $3,500,000 in a Pittsburgh bank and sent its officers into the state for brief periods in connection with the securing and processing of loans.
A review of recent Pennsylvania cases after the latest amendment to its foreign corporation law indicates that "[d]espite the tendency to liberalize State authority over the activities of a foreign corporation,"[31] the courts have not extended jurisdiction over such corporations to the full limit of constitutional latitude under the due process clause. Rather, they have held corporations subject to in personam jurisdiction where its employees or agents within the state acted on behalf of the corporation;[32] they have denied jurisdiction where an independent contractor within the state performed acts for the benefit of the corporation, but otherwise was not present therein.[33]
The state's position is set forth by its highest court in Myers v. Mooney Aircraft, Inc.:[34]
"In Miller v. Kiamesha-Concord, Inc., 420 Pa. 604, 218 A.2d 309 (1966) we met `head on' Section 1011, subd. C (as amended). In Miller, the foreign corporation's sole contact with Pennsylvania consisted of a person who maintained an office in her own home, encouraged travel agencies to recommend to potential customers the foreign corporation's out-of-Pennsylvania hotel, received reservation applications which she transmitted for acceptance or rejection to the out-of-Pennsylvania hotel, was paid on a commission basis for reservations she directly secured and an `over-ride' on commissions paid to travel agencies for reservations secured by them in the Philadelphia area. While it did appear that the name of the foreign corporation was listed in the Philadelphia telephone directory for which listing the foreign corporation did not pay, that the foreign corporation supplied various correspondence forms and advertising literature, nevertheless, we held that the foreign corporation was represented in Pennsylvania only by an independent contractor and that it was not `doing business' in the State...."
Under the facts here presented, in the absence of any contact with a travel agent within Pennsylvania, the most that can be said is that the originating carrier was an independent contractor, and under Pennsylvania law its actions in issuing an interline ticket good on a PRINAIR flight after confirming the availability of space thereon, even if performed *501 within the state, did not subject PRINAIR to Pennsylvania jurisdiction. To require PRINAIR to respond to suit, and upon such ephemeral contact, would raise substantial constitutional questions,[35] not only of due process,[36] but also under the commerce clause.[37] To permit Pennsylvania, upon the fact of the interline arrangement, to exert its judicial power and subject PRINAIR to its jurisdiction, in effect means that it is subject to jurisdiction in every state of the Union where similar interline arrangements exist. Mr. Justice Brandeis, more than fifty years ago, observed that "[o]bviously the sale by a local carrier of through tickets does not involve a doing of business within the state by each of the connecting carriers. If it did, nearly every railroad company in the country would be `doing business' in every state ...."[38] This observation is still appropriate, even recognizing the expanded concept of due process as applied to in personam jurisdiction over foreign corporations or nonresidents.[39] It may be noted that it is those airlines whose resources are too limited to permit them to maintain their own ticket sales offices throughout the nation that would be most burdened were it to be held that an airline is "present" in a state for jurisdictional purposes wherever any other airline, with which the first has an interline arrangement, maintained such an office. The admonition of Chief Justice Warren in Hanson v. Denckla is pertinent:[40]
"But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts.... Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the `minimal contacts' with that State that are a pre-requisite to its exercise of power over him." [citations omitted]
Under all the circumstances herein presented, the defendant's motion to dismiss the actions for lack of in personam jurisdiction is granted. This disposition makes it unnecessary to consider PRINAIR's alternative motion to dismiss for lack of timely service of process.
NOTES
[1] Pa.Stat.Ann. tit. 12, §§ 1602-04 (1953).
[2] Pa.Stat.Ann. tit. 20, §§ 320.601-03 (1953).
[3] Also named as a defendant was The Union Corporation (Union) which, in December 1969, acquired all the capital stock of PRINAIR, which then became a wholly owned subsidiary of Union. Another defendant was PRINAIR, Inc., not to be confused with Puerto Rico International Airlines, Inc. (herein PRINAIR). PRINAIR, Inc., was incorporated at the instance of The Union Corporation as a shell to protect the name when Union acquired the capital stock of the operating company.
[4] In re San Juan, Puerto Rico Air Crash Disaster, 316 F.Supp. 981 (J.P.M.L. 1970).
[5] After the defendant challenged service of process, the plaintiffs, in an effort to cure the alleged initial improper service, served process anew on an officer of PRINAIR in Pennsylvania on August 30, 1971. This service is the subject of an alternative motion to dismiss for lack of timeliness.
[6] Supra n. 3.
[7] Arrowsmith v. United Press Int'l, 320 F.2d 219, 223 (2d Cir. 1963); Florio v. Powder Power Tool Corp., 248 F.2d 367 (3d Cir. 1957); Partin v. Michaels Art Bronze Co., 202 F.2d 541 (3d Cir. 1953); Nelson v. Doll Furniture Co., 304 F. Supp. 159 (E.D.Pa.1969); Optico Corp. v. Standard Tool Co., 285 F.Supp. 46 (E.D.Pa.1968).
[8] Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952).
[9] Cf. KVOS, Inc. v. Associated Press, 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183 (1936); McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); Wade v. Rogala, 270 F.2d 280, 284 (3d Cir. 1959).
[10] See Florio v. Powder Power Tool Corp., 248 F.2d 367, 371 (3d Cir. 1957); Sunbury Wire Rope Mfg. Co. v. United States Steel Corp., 230 F.2d 511 (3d Cir. 1956). But see Meench v. Raymond Corp., 283 F.Supp. 68, 72 (E.D.Pa.1968).
[11] Pa.Stat.Ann. tit. 15, § 2011, subd. C, as amended (Supp.1971).
[12] Scalise v. Beech Aircraft Corp., 276 F. Supp. 58, 62 (E.D.Pa.1967); cf. Cannon Mfg. Co. v. Cudahay Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925).
[13] See Jacobs v. McCloskey & Co., 40 F.R. D. 486 (E.D.Pa.1966); Fitzgerald v. Hilton Hotels Corp., 183 F.Supp. 342 (E.D.Pa.1960); cf. Botwinick v. Credit Exchange, Inc., 419 Pa. 65, 213 A.2d 349 (1965).
[14] Cf. Smeltzer v. Deere & Co., 252 F. Supp. 552 (W.D.Pa.1966); Electrosonics Int'l Inc. v. Wurlitzer Co., 234 F.Supp. 913 (E.D.Pa.1964); Botwinick v. Credit Exchange, Inc., 419 Pa. 65, 213 A.2d 349, 353-354 (1965); Williams v. Rose, 403 Pa. 619, 170 A.2d 577 (1961); Lit v. Storer Broadcasting Co., 217 Pa.Super. 186, 269 A.2d 393 (1970).
[15] Cf. Compania Mexicana Refinadora Island, S. A. v. Compania Metropolitana De Oleoductos, S. A., 250 N.Y. 203, 164 N.E. 907 (1928). See also Cannon Mfg. Co. v. Cudahay Packing Co., 267 U.S. 333, 336, 45 S.Ct. 250, 69 L.Ed. 634 (1925); Blount v. Peerless Chemicals (P.R.) Inc., 316 F.2d 695, 699 (2d Cir.), cert. denied, 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963); Echeverry v. Kellogg Switchboard & Supply Co., 175 F.2d 900, 903 (2d Cir. 1949); Steiner v. Dauphin Corp., 208 F.Supp. 104 (E.D.Pa.1962).
[16] See Botwinick v. Credit Exchange, Inc., 419 Pa. 65, 213 A.2d 349 (1965); Lit v. Storer Broadcasting Co., 217 Pa.Super. 186, 269 A.2d 393 (1970).
[17] See Henson v. Fred Harvey, Inc., 308 F.Supp. 218 (E.D.Pa.1970); Lutz v. Foster & Kester Co., 367 Pa. 125, 79 A. 2d 222 (1951); cf. Business Tax Bureau v. American Cyanamid Co., 426 Pa. 69, 231 A.2d 116, 119 (1967); Alan Wood Steel Co. v. School Dist., 425 Pa. 455, 229 A.2d 881, 886 (1967).
[18] A loan obtained by PRINAIR from a Maryland corporation late in July 1971, a portion of the funds of which was deposited for several days in a Pittsburgh, Pennsylvania bank, is also without relevance. This deposit occurred almost 2½ years after suit was initially commenced, and in any event does not constitute doing business. Cf. Strauss v. Delta Air Lines, Inc., 207 F.Supp. 120 (E.D.Pa. 1962). So, too, that following the argument of this motion, the Wall Street Journal, on December 10, 1971, carried an advertisement of PRINAIR pertaining to its prospectus for the sale of 270,000 shares of common stock, which included the statement "copies of the prospectus may be obtained in any state from such of the several underwriters as may lawfully offer these securities in such a state" is without relevance on the issues here presented.
[19] See Benn v. Linden Crane Co., 326 F. Supp. 995, 997 (E.D.Pa.1971); Henson v. Fred Harvey, Inc., 308 F.Supp. 218, 219 (E.D.Pa.1970); Optico Corp. v. Standard Tool Co., 285 F.Supp. 46, 48 (E.D.Pa.1968). See also Giuliano v. Alitalia Airlines, Inc., 218 F.Supp. 78 (E.D.Pa.1963). Some decisions indicate that the requisites of jurisdiction are determined as of the time of the commencement of the action, which in some states, as under Rule 3 of the Federal Rules of Civil Procedure, occurs upon the filing of the complaint, usually earlier than the date of service of process. See Robert Mitchell Furniture Co. v. Selden Breck Const. Co., 257 U.S. 213, 42 S.Ct. 84, 66 L.Ed. 201 (1921); Herpst v. S.B.I. Liquidating Corp., 279 F.Supp. 928 (E.D. Pa.1968); Proler Steel Corp. v. Luria Bros. & Co., 225 F.Supp. 412 (S.D.Tex. 1964); cf. Anderson v. Southern Bell Tel. & Tel. Co., 209 F.Supp. 921, 923 (M.D.Ga.1962).
[20] See Partin v. Michaels Art Bronze Co., 202 F.2d 541, 542 (3d Cir. 1953).
[21] See Arrowsmith v. United Press Int'l, 320 F.2d 219, 223 (2d Cir. 1963).
[22] Apparently only one court, construing Illinois law, has held that an interline arrangement by itself is sufficient to create jurisdiction. Benjamin v. Delta Air Lines, Inc., Docket No. 70 C 2004 (N.D.Ill. Sept. 10, 1971). It is not, of course, controlling here and this court does not find that Pennsylvania law leads to a similar result. Another court discussed an interline agreement in a jurisdictional context but found it unnecessary to base its conclusion on that factor, in whole or in part. Ciprari v. Servicos Aeros Cruzeiro do Sul, S. A. (Cruzeiro), 232 F.Supp. 433 (S.D.N.Y.1964). See also Lawson v. Pan American World Airways, Inc., 30 Misc.2d 274, 216 N.Y. S.2d 549 (Sup.Ct.1961). Interline agreements have been considered in other contexts. See, e. g., Eck v. United Arab Airlines, Inc., 360 F.2d 804 (2d Cir. 1966) (office of an originating carrier is a "place of business" under the venue provision of the Warsaw Convention); McManus v. Capital Airlines, Inc., 166 F. Supp. 301 (E.D.N.Y.1958) (sale of tickets under interline agreement not "doing business" under venue provision of the Clayton Act).
[23] Scafati v. Bayerische Motoren Werke AG, 53 F.R.D. 256 (W.D.Pa.1971). See also Benn v. Linden Crane Co., 326 F. Supp. 995 (E.D.Pa.1971). But see Meench v. Raymond Corp., 283 F.Supp. 68, 72 (E.D.Pa.1968).
[24] 236 F.Supp. 71 (E.D.Pa.1964).
[25] 218 F.Supp. 78 (E.D.Pa.1963).
[26] 241 F.Supp. 611 (E.D.Pa.1965).
[27] Sampson-Miller Associated Cos. v. Washington Homes, Inc., 303 F.Supp. 739 (W.D.Pa.1969); Kelly v. United States Steel Corp., 198 F.Supp. 640 (W.D.Pa. 1960); Miller v. Tulsa Petroleum Co., 117 F.Supp. 359 (M.D.Pa.1953).
[28] 285 F.Supp. 46, 47 (E.D.Pa.1968).
[29] A different result under the facts of that case would apparently be required under the 1968 amendment to the Pennsylvania statute providing that "the shipping of merchandise ... into ... [Pennsylvania] shall be considered [doing business]." Pa.Stat.Ann. tit. 15, § 2011, subd. C, as amended (Supp.1971). In the instant case no shipment of goods is involved.
[30] 207 F.Supp. 120 (E.D.Pa.1962).
[31] Di Lido Hotel v. Nettis, 215 Pa.Super. 284, 257 A.2d 643, 648 (1969).
[32] See, e. g., Myers v. Mooney Aircraft, Inc., 429 Pa. 177, 240 A.2d 505 (1967); Goldstein v. Carillon Hotel, 424 Pa. 337, 227 A.2d 646 (1967).
[33] See, e. g., Wenzel v. Morris Distrib. Co., 439 Pa. 364, 266 A.2d 662 (1970); Miller v. Kiamesha-Concord, Inc., 420 Pa. 604, 218 A.2d 309 (1966).
[34] 429 Pa. 177, 240 A.2d 505, 511 (1967).
[35] Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952); International Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L.Ed. 95 (1945).
[36] In the absence of clear indication from the Pennsylvania courts that they would regard activity such as that of PRINAIR as "doing business" in the state, this court should avoid that construction of the Pennsylvania statute. See Aquascutum of London, Inc. v. S. S. American Champion, 426 F.2d 205, 211-212 (2d Cir. 1970).
[37] See Scanapico v. Richmond, F. & P. R. R., 439 F.2d 17, 25-26 (2d Cir. 1970) (reconsideration en banc) and cases cited therein.
[38] Philadelphia & Reading Ry. v. McKibbin, 243 U.S. 264, 268, 37 S.Ct. 280, 281, 61 L.Ed. 710 (1917).
[39] See Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).
[40] 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958).